1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **CENTRAL DISTRICT OF CALIFORNIA**

10

11   ROLAND P.,[1]                    ) Case No. EDCV 19-1216-JPR
                                      )
12                   Plaintiff,       )
                                      ) MEMORANDUM DECISION AND ORDER
13            v.                      ) AFFIRMING COMMISSIONER
                                      )
14   ANDREW M. SAUL,                  )
     Commissioner of Social           )
15   Security,                        )
                                      )
16                   Defendant.       )
                                      )
17   ─────────────────────────────────

18   **I.   PROCEEDINGS**

19        Plaintiff seeks review of the Commissioner's final decision

20   denying his application for Social Security supplemental security

21   income benefits ("SSI").  The parties consented to the

22   jurisdiction of the undersigned under 28 U.S.C. § 636(c).  The

23   matter is before the Court on the parties' Joint Submission,

24   ───────────────

25        [1] Plaintiff's name is partially redacted in line with
     Federal Rule of Civil Procedure 5.2(c)(2)(B) and the
26   recommendation of the Committee on Court Administration and Case
     Management of the Judicial Conference of the United States.
27   Although his first name sometimes appears in the record as
     "Ronald," it is in fact Roland.  (See, e.g., AR 194 (Plaintiff or
28   his wife writing his name as "Roland").)

                                      1

filed February 24, 2020, which the Court has taken under
submission without oral argument.  For the reasons stated below,
the Commissioner's decision is affirmed.

**II.   BACKGROUND**

    Plaintiff was born in 1968.  (Administrative Record ("AR")
173.)  He completed sixth grade (AR 47), having attended special-
education classes since first grade (AR 184).  He worked "odd
jobs" from 1997 to 2008.  (AR 175, 191.)  On June 18, 2015, he
applied for SSI, alleging disability since January 1, 2008,
because of chronic obstructive pulmonary disease, brain tumor,
asthma, seizures, and "rage and depression."  (AR 61, 183-84.)
After his application and reconsideration of it were denied (AR
79-80, 106-11), he requested a hearing before an Administrative
Law Judge (AR 113).  A hearing was held on May 17, 2018, at which
Plaintiff, represented by counsel, testified, as did a vocational
expert.  (AR 42-60.)  In a written decision issued August 21,
2018, the ALJ found him not disabled.  (AR 26-36.)  On May 17,
2019, the Appeals Council denied his request for review.  (AR 1-
3.)  This action followed.

**III. STANDARD OF REVIEW**

    Under 42 U.S.C. § 405(g), a district court may review the
Commissioner's decision to deny benefits.  The ALJ's findings and
decision should be upheld if they are free of legal error and
supported by substantial evidence based on the record as a whole.
See Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v.
Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence
means such evidence as a reasonable person might accept as
adequate to support a conclusion.  Richardson, 402 U.S. at 401;

2

1  <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035 (9th Cir. 2007).  It

2  is "more than a mere scintilla but less than a preponderance."

3  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec.</u>

4  <u>Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).  "[W]hatever the

5  meaning of 'substantial' in other contexts, the threshold for

6  such evidentiary sufficiency is not high."  <u>Biestek v. Berryhill</u>,

7  139 S. Ct. 1148, 1154 (2019).  To determine whether substantial

8  evidence supports a finding, the reviewing court "must review the

9  administrative record as a whole, weighing both the evidence that

10  supports and the evidence that detracts from the Commissioner's

11  conclusion."  <u>Reddick v. Chater</u>, 157 F.3d 715, 720 (9th Cir.

12  1998).  "If the evidence can reasonably support either affirming

13  or reversing," the reviewing court "may not substitute its

14  judgment" for the Commissioner's.  <u>Id.</u> at 720-21.

15  **IV.   THE EVALUATION OF DISABILITY**

16      People are "disabled" for purposes of receiving Social

17  Security benefits if they are unable to engage in any substantial

18  gainful activity owing to a physical or mental impairment that is

19  expected to result in death or has lasted, or is expected to

20  last, for a continuous period of at least 12 months.  42 U.S.C.

21  § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir.

22  1992).

23      A.   <u>The Five-Step Evaluation Process</u>

24      An ALJ follows a five-step sequential evaluation process to

25  assess whether someone is disabled.  20 C.F.R. § 416.920(a)(4);

26  <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as

27  amended Apr. 9, 1996).  In the first step, the Commissioner must

28  determine whether the claimant is currently engaged in

3

substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. § 416.920(a)(4)(ii) & (c).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., part 404, subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii) & (d).

Before proceeding to step four, the ALJ must determine the claimant's residual functional capacity ("RFC").[2] § 416.920(e); see also Laborin v. Berryhill, 867 F.3d 1151, 1153 (9th Cir. 2017) (ALJ assesses claimant's RFC between steps three and four). The fourth step requires that the ALJ determine whether the claimant's RFC is sufficient to perform past relevant work. § 416.920(a)(4)(iv). When the claimant has no past relevant work, the Commissioner then bears the burden of establishing that he is not disabled because he can perform other substantial gainful work in the national economy, the fifth and

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations. § 416.945(a)(1); see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

4

1  final step of the analysis.  §§ 416.920(a)(4)(v), 416.960(c)(2);

2  Drouin, 966 F.2d at 1257.

3        B.  The ALJ's Application of the Five-Step Process

4        At step one, the ALJ found that Plaintiff had not engaged in

5  substantial gainful activity since June 18, 2015, the application

6  date.  (AR 28.)  At step two, he determined that he had the

7  severe impairments of "schizoid personality disorder, bipolar

8  disorder, history of a seizure disorder, chronic obstructive

9  pulmonary disease (COPD), and obstructive sleep apnea."  (Id.)

10       At step three, he concluded that Plaintiff's impairments did

11  not meet or equal any of the impairments in the Listing.  (AR 29-

12  30.)  At step four, he found that Plaintiff had the RFC to

13  perform light work with additional limitations:

14        Can sit about six hours total and can stand and/or walk
15        about six hours total in an eight-hour workday with
16        normal breaks.  Can never climb ladders, ropes, or
17        scaffolds, but can frequently climb ramps and stairs.
18        Can frequently balance, kneel, stoop, crouch, and crawl.
19        Can never be exposed to concentrated levels of pulmonary
20        irritants.  Can never operate a motor vehicle as a work
21        requirement.  Can not [sic] work around unprotected
22        heights, moving machinery, or large bodies of water.  Can
23        perform simple, routine tasks that can be learned in 30
24        days or less with an SVP of 1 or 2, requiring visual
25        demonstration learning.  Can tolerate occasional changes
26        to work place setting or procedures.  Can have only
27        occasional interaction with coworkers, supervisors, and
28        the public.

5

(AR at 30-31.)  Because Plaintiff had no past relevant work, the ALJ continued to step five.  (AR 34.)

At that step, considering Plaintiff's age, education, work experience, and RFC and the VE's testimony, he found that Plaintiff could perform several jobs existing in significant numbers in the national economy.  (AR 34-35.)  Accordingly, he found him not disabled.  (AR 35.)

**V.   DISCUSSION**[3]

Plaintiff contends that the ALJ improperly rejected his "testimony concerning his subjective symptoms by failing to offer any specific, clear and convincing reasons supported by substantial evidence in the record."  (J. Stip. at 3.)  He specifically challenges only the ALJ's assessment of his statements concerning his respiratory ailments.  (See id. at 4-6, 12-13.)  For the reasons discussed below, the ALJ did not err.

---

[3] In Lucia v. SEC, 138 S. Ct. 2044, 2055 (2018), the Supreme Court held that ALJs of the Securities and Exchange Commission are "Officers of the United States" and thus subject to the Appointments Clause.  To the extent Lucia applies to Social Security ALJs, Plaintiff has forfeited the issue by failing to raise it during his administrative proceedings.  (See AR 43-60, 248-50); Meanel v. Apfel, 172 F.3d 1111, 1115 (9th Cir. 1999) (as amended) (plaintiff forfeits issues not raised before ALJ or Appeals Council); see also Kabani & Co. v. SEC, 733 F. App'x 918, 919 (9th Cir. 2018) (rejecting Lucia challenge because plaintiff did not raise it during administrative proceedings), cert. denied, 139 S. Ct. 2013 (2019).

6

1    The ALJ Gave Clear and Convincing Reasons to Partially

2    Discount Plaintiff's Subjective Symptom Statements

3         A.   Relevant background[4]

4              1.   *Plaintiff's treating doctors*

5    Plaintiff was treated from June 23, 2014, through November

6    20, 2017, by primary-care physician Vivek Gill.  (AR 251-60, 373-

7    414.)  Progress notes are mostly illegible but indicate that Dr.

8    Gill prescribed Depakote ER[5] on June 23, 2014 (AR 255), examined

9    Plaintiff prehydrocelectomy[6] on February 16, 2015 (AR 253, 295-

10   96), noted complaints of breathing problems on June 30, 2015 (AR

11   377), and referred him for a CT scan on January 25, 2017, after

12   finding a "slightly enlarged lymph node in [his] che[s]t" (AR

13   400; see also id. at 412-14).  On November 21, 2017, Plaintiff's

14   chief complaint was "[c]heck blood pressure," and Dr. Gill

15   reported a history of "[grand mal] seizures; [m]ild compression T

16   7, 9, 10; COPD; 6 MM Frontoparietal Meningioma;[7] COPD with

17

18        [4] Because Plaintiff challenges only the ALJ's findings
     concerning his respiratory-impairment symptoms, the Court limits
19   its discussion primarily to those facts.

20        [5] "Depakote ER . . . is indicated for the treatment of acute
     manic or mixed episodes associated with bipolar disorder, with or
21   without psychotic features."  Depakote ER, U.S. Nat'l Libr. of
     Med., https://dailymed.nlm.nih.gov/dailymed/drugInfo (type
22   "Depakote ER"; then follow first Depakote ER hyperlink) (last
     visited May 18, 2020).
23

24        [6] "A hydrocelectomy is a surgical procedure to repair a
     hydrocele, which is a buildup of fluid around a testicle."
25   Hydrocelectomy: What You Need to Know, Healthline, https://
     www.healthline.com/health/hydrocelectomy (last visited May 18,
26   2020).

27        [7] "A meningioma is a tumor that arises from a layer of
28                                              (continued...)

7

Asthma; [and] L. Hilar L. nodes."[8]  (AR 374.)

Plaintiff's CT scan indicated "[e]nlarged adenoids, evaluate for lymphoproliferative disease."[9]  (AR 389.)  The scan found "[n]o pathologically enlarged lymph nodes," and as to Plaintiff's lungs, airways, and pleura, the "trachea and central airways [were] . . . clear," and there was "approved scarring" in the left upper and lower lobes, "stable linear . . . scarring/ nodularity" in the lateral right lower and left upper lobes, "[n]o new or suspicious pulmonary nodules," "mild emphysema," and "bullous disease[10] . . . similar to the prior exam."  (Id.)  The

---

[7] (...continued)
tissue (the meninges) that covers the brain and spine. . . . Most are considered 'benign' because they are slow-growing with low potential to spread."  Meningioma Brain Tumor, UCLA Health, https://www.uclahealth.org/neurosurgery/meningioma-brain-tumor (last visited May 18, 2020).

[8] "Hilar lymph nodes are those that are immediately adjacent to the main-stem bronchus and hilar vessels, including the proximal portions of the pulmonary veins and main pulmonary artery."  Ahmed H. El-Sherief et al., Lymph Node Map: Radiologic Review with CT Illustration, 6 RadioGraphics 1680, 1684 (Oct. 2014), available at https://pubs.rsna.org/doi/pdf/10.1148/rg.346130097.

[9] In lymphoproliferative disease, "cells of the lymphatic system grow excessively"; it is often treated like cancer. Lymphoproliferative Disorder, Nat'l Cancer Inst., https://www.cancer.gov/publications/dictionaries/cancer-terms/def/lymphoproliferative-disorder (last visited May 18, 2020).

[10] "[A] bulla is an air-filled space of > 1 cm in diameter within the lung which has developed because of emphysematous destruction of the lung parenchyma. . . . Eighty percent of patients presenting with bullae have associated pulmonary emphysema, [which] is referred to as bullous emphysema.  It is a subset of chronic obstructive pulmonary disease."  Bullous Emphysema, Nat'l Ctr. for Biotechnology Info., https://
(continued...)

8

radiologist found the "newly prominent . . . lymph nodes . . . indeterminate" and recommended a "[s]hort-term follow-up CT chest . . . in 3 months." (AR 391.) That follow-up scan found Plaintiff's lung changes "stable" and "benign." (AR 387.)

Dr. Gill referred Plaintiff for a neurology history and physical, which was performed by neurologist Raj Karnani on June 10, 2014. (AR 342.) Dr. Karnani found Plaintiff normal in all areas and described him as "[a]lert and oriented." (Id.)

Plaintiff was admitted to the hospital on August 29, 2014, with "flu-like symptoms," then discharged the next day; his diagnosis was acute bronchitis. (AR 267-76.) On October 7, 2014, he saw neurologist Purnima Thakran for his seizures. (AR 327-29.) They had begun approximately four years prior and were "mild," with a "duration [of] 3-4 minutes." (AR 327.) They were aggravated by a "brain tumor," and associated symptoms were "an aura preceeding [sic] the seizure, lightheadedness, confusion, [and] nausea." (Id.) Dr. Thakran noted that Plaintiff's

> [o]verall condition is variable. The patient was on Dilantin initially which worked well for seizure control but caused gum hyperplasia and patient lost all his teeth. Now on Depakote but tolerating poorly due to extreme mood swings, anger.

(Id.) She assessed him with "[l]ocalization-related epilepsy with complex partial seizures with intractable epilepsy" and

---

[10] (...continued)
www.ncbi.nlm.nih.gov/books/NBK537243/ (last visited May 18, 2020).

meningioma and prescribed oxcarbazepine,[11] continued Depakote, ordered an EEG, and planned to "taper Depakote next visit." (AR 328.)  She continued him on Ventolin HFA Aerosol Solution[12] and Qvar Aerosol Solution[13] daily.  (Id.)  As to injury prevention, Dr. Thakran recommended "no driving, climbing to heights, operating machinery, swimming alone or other hazardous activity." (AR 329.)

The EEG was performed on October 31, 2014, and showed "[n]ormal awake/asleep." (AR 339.)  Because "a routine normal EEG does not preclude a diagnosis of epilepsy," "[c]linical correlation [was] recommended." (Id.)  On August 25, 2015, another EEG was recorded, with a clinical impression of "[n]ormal 72 hour ambulatory EEG." (AR 337.)  At Plaintiff's EEG follow-up appointment, Dr. Thakran noted, "[i]mproving seizures." (AR 335.)

At her recommendation, Plaintiff had a brain MRI on August

---

[11] Oxcarbazepine tablets are "indicated for use as monotherapy or adjunctive therapy in the treatment of partial-onset seizures in adults." Oxcarbazepine, U.S. Nat'l Libr. of Med., https://dailymed.nlm.nih.gov/dailymed/drugInfo (type "Oxcarbazepine"; then follow first hyperlink for Oxcarbazepine) (last visited May 18, 2020).

[12] "Ventolin HFA Inhalation Aerosol is indicated for the treatment or prevention of bronchospasm in patients aged 4 years and older with reversible obstructive airway disease." Ventolin HFA, U.S. Nat'l Libr. of Med., https://dailymed.nlm.nih.gov/ dailymed/drugInfo (type "Ventolin HFA"; then follow first hyperlink for Ventolin HFA (albuterol sulfate) aerosol, metered) (last visited May 18, 2020).

[13] "Qvar is used to prevent asthma attacks in adults and children who are at least 5 years old." Qvar, Drugs.com, https://www.drugs.com/mtm/qvar.html (last visited May 18, 2020).

31, 2016.  (AR 357, 365-66.)  It found a "[v]ery mild interval increase in size of a small . . . mass which likely represents a meningioma."  (AR 366.)  It "[a]gain identified extensive bilateral mastoid air cell disease" and "[e]nlarged adenoids with mild cystic changes . . . likely secondary to reactive lymphoid hypertrophy,"[14] but clinical correlation was suggested because "lymphoma cannot be entirely excluded."  (Id.)  At Plaintiff's next three appointments, in 2017, he reported no further seizures, and Dr. Thakran recommended continued observation, "serial MRI" for the brain tumor, and refill of medication for seizures.  (AR 344-51.)

Dr. Robert Tsou, an ear, nose, and throat specialist, treated Plaintiff for "bilateral nasal airway obstruction" and "hearing loss" throughout 2017 and into 2018.  (AR 427-43.)  He excised a nasal mass and inserted tubes in his ears.  (AR 435-37.)  His condition improved but congestion persisted, "likely . . . due to allergies."  (AR 439.)  Attempts to remove the tubes resulted "in violent reaction of discomfort," so Dr. Tsou allowed "time for the PE tube[s] to extrude on their own."  (AR 441.)  Four months later, Plaintiff was "having difficulty hearing again" and had "recurrent atrial congestion."  (AR 442.)

On February 28, March 21, and April 12, 2018, pulmonologist Anurag Sahai examined Plaintiff and tested his lung capacity,

---

[14] Lymphoid hypertrophy "is an increase in the number of normal cells (called lymphocytes) that are contained in lymph nodes," most often occurring "when there is an infection with bacteria, viruses, or other types of germs and is part of the body's reaction to the infection."  Lymphoid hyperplasia, U.S. Nat'l Libr. of Med., https://medlineplus.gov/ency/article/ 001320.htm (last visited May 18, 2020).

spirometry, and diffusing capacity.  (AR 452-59.)  Plaintiff's
reasons for seeing him were COPD, obstructive sleep apnea, and
mediastinal adenopathy.[15]  (AR 452, 455.)  As to chest and lungs
and cardiovascular exams, Dr. Sahai found Plaintiff "normal" but
with "prolonged expiration — both lung fields."  (AR 453, 456.)
These results were interpreted as a "severe obstructive lung
defect":

> The airway obstruction is confirmed by the decrease in
> flow rate at peak flow and flow at 50% and 75% of the
> flow volume curve.  EVC changed by 8%, FEV1 changed by
> 8%.  This is interpreted as an insignificant response to
> bronchodilator.

(AR 458.)  Dr. Sahai performed a spirometry on March 21, 2018,
indicating a FEV1 of 2.29 before bronchodilation and 2.48 after,
and an FVC of 5.74 before bronchodilation and 6.17 after.[16]
(AR 459.)  Handwritten notes reflect "moderate obstruction
defect," and "diffusion capacity normal."  (AR 458-59.)

---

[15] Adenopathy means "[l]arge or swollen lymph nodes."  Med.
Definition of Adenopathy, MedicineNet, https://
www.medicinenet.com/script/main/art.asp?articlekey=22429 (last
visited May 18, 2020).

[16] The pulmonary function test, most commonly spirometry,
measures ventilation of the lungs.  See 20 C.F.R. pt. 404, subpt.
P, app. 1, § 3.00(D)(4) (2020).  Normal results vary from person
to person based on age, race, height, and gender.  Spirometry
Normal Values and How to Read Your Results, Healthline, https://
www.healthline.com/health/spirometry#results (last visited May
18, 2020).  For Caucasian men aged 50 and 68 inches tall, like
Plaintiff, the "lower limit of normal" for FVC is 3.85 and for
FEV1 2.93.  Spirometry Reference Value Calculator, Nat'l Inst.
for Occupational Safety & Health, https://www.cdc.gov/niosh/
topics/spirometry/refcalculator.html (last visited May 18, 2020).

### 2.  *Examiners and reviewers*

Dr. Seung Ha Lim, an internist, examined Plaintiff on November 24, 2015, at Defendant's request.  (AR 317-20.)  He described Plaintiff's chief complaints as "[h]istory of seizures and asthma."  (AR 317.)  Dr. Lim performed a pulmonary function test documenting FEV1 of 2.32 before bronchodilation and 2.50 after, and an FVC of 4.56 before bronchodilation and 4.27 after.  (AR 312.)  Dr. Lim interpreted these findings as "severe obstructive lung disease," noting that it "improved [with] bronchodilation."  (Id.)  After conducting a full examination of Plaintiff, he provided the following functional assessment:

> Based on available medical information, the patient, in my opinion, is restricted to standing and/or walking about 6 hours in an eight-hour workday with appropriate breaks.  The patient would be able to sit for 6 hours in an eight-hour day with appropriate breaks.  The patient would be able to lift and/or carry 20 pounds occasionally and 10 pounds frequently.  The patient should avoid unprotected heights and handling of dangerous machinery. The patient has environmental limitations due to a history of asthma.

(AR 320.)

A pulmonary function test was performed again on June 2, 2018, reflecting an FEV1 of 1.61 before bronchodilation and 1.51 after.  (AR 446.)  It showed an FVC of 3.43 before bronchodilation and 3.36 after.  (Id.)  Interpretation notes indicate "severe obstruction."  (Id.)

Dr. Gideon Lowe, III, an ophthalmologist (see AR 81 (showing

signature code of 28)); Soc. Sec. Admin., Program Operations
Manual System (POMS) DI 24501.004 (May 5, 2015), https://
secure.ssa.gov/apps10/poms.nsf/lnx/0424501004 (signature code 28
indicates ophthalmology), reviewed the files on February 18,
2016, and rated Plaintiff's exertional limitations similarly to
Dr. Lim. (AR 74-76.) He further noted that Plaintiff had
unlimited ability to "push and/or pull (including operation of
hand and/or foot controls)" and was limited to occasionally
"climbing ramps/stairs," "stooping," "kneeling," "crouching," and
"crawling." (AR 75.) He found limitations in exposure to
unprotected heights and environmental factors because of
Plaintiff's seizure disorder and asthma. (AR 75-76.) On
reconsideration, Dr. E. Cooper concurred with the limitations
identified by Dr. Lowe.[17] (AR 91-93.)

Psychiatrist R. Singh reviewed Dr. Thakran's opinion on
reconsideration and gave it "great weight."[18] (AR 90.) As for
Plaintiff's subjective symptoms, he opined that

[b]ased on the statements of allegations compared to the
enclosed objective evidence, the statements appear
partially credible. The impairments could be expected to
produce some of the claimant's stated symptoms but MER
and ADLs do[] not support the level of severity of the
claimant's stated limitations.

---

[17] Dr. Cooper's area of specialty is not apparent from the
record.

[18] Dr. Singh used a signature code of 37 (see AR 98),
indicating a psychiatry specialty, see Soc. Sec. Admin., Program
Operations Manual System (POMS) DI 24501.004 (May 5, 2015),
https://secure.ssa.gov/apps10/poms.nsf/lnx/0424501004.

14

(<u>Id.</u>)

### 3.   Plaintiff's statements

Plaintiff described in his function report how his "illnesses, injuries, or conditions" limited his ability to work:

> Seizures, confusion, rage, cannot go into sun or white light for extended time without throwing up, no control over function[.]  Difficulty seeing, dehydration, fainting[.]  Cannot work with people getting violent, upset, anxiety, panic attacks[.]

(AR 199.)  On a typical day he had coffee, watched television, and tried to work in the yard if he could.  (AR 200.)  His sleep was affected because he could not "stop thoughts and voices." (<u>Id.</u>)  His ability to perform personal care was not limited; he prepared "tv dinners" daily and mowed a small yard, with stops for dizziness.  (AR 200-01.)  He needed reminders to take medicines and do chores.  (AR 201.)  He argued and fought with others and had "no social life."  (AR 204.)

At Plaintiff's hearing, he described why he believed he was unable to work:

> I can't breathe at all.  And I have a hard time being around people.  That's pretty much it.  My hands are on fire all the time, the medicine.  I don't sleep much at all.  And the little bit I do sleep, when I wake up from it, I can't breathe.  It takes me an hour, hour and a half of choking and puking to get my lungs back to breathing.  That's pretty much it.

(AR 49-50.)  He couldn't do much housework because dust bothered him, and he had to take breaks when showering or shaving because

15

he couldn't breathe.  (AR 50-51.)  He left the house only to go
to doctor's appointments because "[o]ther people are safer."  (AR
51.)

### 4.   The ALJ's decision

The ALJ found that Plaintiff's "medically determinable
impairments could reasonably be expected to cause the alleged
symptoms; however, [his] statements concerning the intensity,
persistence, and limiting effects of these symptoms are not
entirely consistent with the medical evidence and other evidence
in the record."  (AR 31.)  Despite a history of respiratory
difficulties, he noted, "x-rays of his chest and lungs were
essentially normal."  (Id.)  While treatment records documented
diagnoses of "asthma, COPD, as well as a newly-diagnosed brain
tumor," "physical examinations were within normal limits, with no
documented abnormalities."  (Id.)  He noted Plaintiff's history
of seizures but observed that the condition appeared "to be
manageable with medications."  (Id.)

Relying on Dr. Lim's November 2015 consulting opinion, to
which he gave "great weight" (AR 33), the ALJ recognized
documented complaints of "seizure disorder and asthma" but noted
that overall Plaintiff had an "unremarkable objective
presentation."  (AR 32.)  After a change in medication, he had
not had any seizures for several months.  (Id.)  He "reported
daily asthma attacks" and an "increased expiratory phase of
breathing on auscultation," "consistent with COPD," but Dr. Lim
nonetheless opined that he could "stand or walk for six hours
total and sit for six hours total in an eight-hour workday,"
"lift 20 pounds occasionally and 10 pounds frequently," and

should "avoid unprotected heights and handling of dangerous machinery, as well as respiratory irritants due to his asthma," which was inconsistent with Plaintiff's claimed limitations. (Id.)

The ALJ noted the results of pulmonary function tests in November 2015 and March and June 2018, showing FEVI and FVC levels before and after bronchodilation. (Id.) A CT of Plaintiff's chest in December 2017 "showed stable lung findings consistent with COPD," and a CT of his sinuses "showed no evidence of sinusitis, but did note a septal deviation." (Id.) He had a "normal awake/sleep EEG." (Id.)

The ALJ found Plaintiff's allegations "somewhat out-of-proportion to the medical findings." (AR 33.) They were "not fully consistent" with the "objective medical evidence and the record as a whole." (Id.) Although the medical records documented asthma and COPD, they reflected "only mild objective findings." (Id.) Plaintiff had "a normal ambulatory EEG, he could manage his asthma with medications, and consistently exhibited respiratory test values within the mild to moderate range." (Id.) Construing the evidence in the light most favorable to him, the ALJ found Plaintiff capable of "light exertion" with postural and environmental limitations. (Id.)

B.   Applicable law

An ALJ's assessment of a claimant's allegations concerning the severity of his symptoms is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989) (as amended) (citation omitted); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985) (as amended Feb. 24, 1986). "[T]he ALJ is not 'required to

17

1  believe every allegation of disabling pain, or else disability

2  benefits would be available for the asking, a result plainly

3  contrary to 42 U.S.C. § 423(d)(5)(A).'" Molina v. Astrue, 674

4  F.3d 1104, 1112 (9th Cir. 2012) (quoting Fair v. Bowen, 885 F.2d

5  597, 603 (9th Cir. 1989)).

6        In evaluating a claimant's subjective symptom testimony, the

7  ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d

8  at 1035-36; see also SSR 16-3p, 2016 WL 1119029, at *3 (Mar. 16,

9  2016).  "First, the ALJ must determine whether the claimant has

10 presented objective medical evidence of an underlying impairment

11 [that] could reasonably be expected to produce the pain or other

12 symptoms alleged."  Lingenfelter, 504 F.3d at 1036 (citation

13 omitted).  If such objective medical evidence exists, the ALJ may

14 not reject a claimant's testimony "simply because there is no

15 showing that the impairment can reasonably produce the degree of

16 symptom alleged."  Id. (citation omitted and emphasis in

17 original).

18       If the claimant meets the first test, the ALJ may discount

19 the claimant's subjective symptom testimony only if he makes

20 specific findings that support the conclusion.  See Berry v.

21 Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

22 affirmative evidence of malingering, the ALJ must provide a

23 "clear and convincing" reason for rejecting the claimant's

24 testimony.  Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir.

25 2015) (as amended) (citing Lingenfelter, 504 F.3d at 1036;

26 Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1102 (9th

27 Cir. 2014).  The ALJ may consider, among other factors, the

28 claimant's (1) reputation for truthfulness, prior inconsistent

18

statements, and other testimony that appears less than candid;
(2) unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment; (3)
daily activities; (4) work record; and (5) physicians' and third
parties' statements. <u>Rounds v. Comm'r Soc. Sec. Admin.</u>, 807 F.3d
996, 1006 (9th Cir. 2015) (as amended); <u>Thomas v. Barnhart</u>, 278
F.3d 947, 958-59 (9th Cir. 2002).  If the ALJ's evaluation of a
plaintiff's alleged symptoms is supported by substantial evidence
in the record, the reviewing court "may not engage in second-
guessing."  <u>Thomas</u>, 278 F.3d at 959.

C.   <u>Analysis</u>

The ALJ provided clear and convincing reasons supported by
substantial evidence for partially discounting Plaintiff's
subjective symptom statements.  Initially, the ALJ properly
concluded that Plaintiff's subjective complaints were
inconsistent with the objective medical evidence (AR 31), which
is a "sufficient basis" for rejecting a claimant's subjective
symptom testimony.  <u>Carmickle v. Comm'r., Soc. Sec. Admin.</u>, 533
F.3d 1155, 1161 (9th Cir. 2008) (citation omitted); <u>see also</u>
<u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 600 (9th Cir.
1999) (upholding "conflict between [plaintiff's] testimony of
subjective complaints and the objective medical evidence in the
record" as "specific and substantial" reason undermining
statements).  Specifically, the ALJ cited to "essentially normal"
x-rays of his chest and lungs, physical examinations "within
normal limits, with no documented abnormalities," inconsistent
reporting of seizures, and "normal awake/sleep EEG."  (AR 31-32.)

Plaintiff challenges the ALJ's evaluation of the medical

19

evidence, arguing that three pulmonary tests indicated "severe obstructive lung disease" and supported his symptom statements. (J. Stip. at 4; see also id. at 13 (noting doctors' notations of obstructive lung defect).)  But as the ALJ recognized and Plaintiff has not challenged, Plaintiff's respiratory ailments were not restrictive enough to meet a Listing (see AR 29), and a "severe" impairment does not necessarily imply a disabling functional limitation.  See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993) (rejecting claim of disability when plaintiff failed to meet burden to prove impairment was disabling).  The ALJ acknowledged that treatment records showed a "history of respiratory difficulties," asthma, and COPD but nevertheless recognized that objective medical tests and findings indicated "normal" chest and lung x-rays, physical examinations, and "awake/sleep EEG."  See Stoffan v. Berryhill, No. 16-CV-1654-SKO, 2018 WL 1335392, at *10 (E.D. Cal. Mar. 15, 2018) (no disability when plaintiff with syncope, COPD, depression, and chronic pain "was in no acute distress, appeared healthy, had good air movement, and ambulated normally").  As the ALJ noted (AR 29, 31-32), Plaintiff's mild to moderate FVC and FEV1 test results were inconsistent with his claim that he couldn't "breathe at all" (AR 49, 51).  And his normal sleep EEG contradicted his assertion that he couldn't sleep "much at all."  (AR 49-50.)

Second, medical records showed that Plaintiff's seizures, COPD, and asthma were "manageable," "stable," and controlled with medications, as the ALJ found.  (AR 31, 33.)  "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."

_Warre v. Comm'r of Soc. Sec. Admin._, 439 F.3d 1001, 1006 (9th Cir. 2006); _see also_ _Danny L. R. II v. Saul_, No. SA CV 19-498-PLA, 2020 WL 264583, at *10 (C.D. Cal. Jan. 17, 2020) (ALJ's finding that pain medication provided relief from chronic pain syndrome and mental-health medications controlled anxiety and depression was clear and convincing reason to discount plaintiff's subjective symptom testimony).  Indeed, Plaintiff's "auras" lessened after starting seizure medication in October 2014 (_see_ AR 327-36), and he was seizure free at all three appointments in 2017 (AR 344-51), with normal awake/asleep and ambulatory EEGs (AR 337, 339).  And his COPD while on medication was "mild," and he had "normal" lung diffusion capacity.  (AR 455, 458.)  Contrary to Plaintiff's contention raised for the first time in his reply (_see_ J. Stip. at 13), the ALJ's finding that many of his conditions were manageable with medication was amply supported by the record.

Finally, the ALJ relied on examining and reviewing doctors' opinions that Plaintiff could work with appropriate limitations to discount his statements to the contrary.  (_See_ AR 32-34.) This is a separate, independent reason from inconsistency with the objective medical evidence, _see_ § 416.929(c)(4); _Molina_, 674 F.3d at 1113 (examining doctor's opinion that condition "was not severe" and could be "control[led]" was "specific, clear, and convincing reason[]" to reject subjective symptom testimony); _Moncada v. Chater_, 60 F.3d 521, 524 (9th Cir. 1995) (per curiam) (examining doctor's assessment that plaintiff "could do sedentary work" was "specific" and "valid" reason to reject his "claims of excessive pain"), contrary to Plaintiff's implication (_see_ J.

Stip. at 5-6).  The ALJ gave "great weight" to the opinions of Dr. Lim and the "State agency doctors and psychologists." (AR 33-34.)  And he cited specific portions of treatment notes and data from treating physicians Gill's and Thakran's records to support his findings and to partially discount Plaintiff's statements.  (See AR 29, 31-32.)  Further, Dr. Lim's opinion was consistent with the RFC.  Plaintiff never addresses the ALJ's reliance on the doctors' opinions as a separate reason to discount his statements.

The ALJ properly considered the objective medical evidence, the doctors' opinions, and Plaintiff's ability to control his symptoms with treatment in partially discounting his statements about them.  (AR 32.)  In doing so, he provided clear and convincing reasons and did "not arbitrarily discredit" Plaintiff's testimony.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ did not err, and remand is not warranted.

1

## VI.   CONCLUSION

2      Consistent with the foregoing and pursuant to sentence four
3  of 42 U.S.C. § 405(g),[19] IT IS ORDERED that judgment be entered
4  DENYING Plaintiff's request for remand, AFFIRMING the
5  Commissioner's decision, and DISMISSING this action with
6  prejudice.

7

8  DATED: May 20, 2020                _____
9                                     JEAN ROSENBLUTH
                                      U.S. Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25  _____

26      [19] This sentence provides: "The [district] court shall have
   power to enter, upon the pleadings and transcript of the record,
27  a judgment affirming, modifying, or reversing the decision of the
   Commissioner of Social Security, with or without remanding the
28  cause for a rehearing."

23